Leon ROOT, Plaintiff,

v.

Margaret M. HECKLER, Secretary,
Department of Health and Human
Services, Defendant.

Civ. A. No. 83–882 CMW.

United States District Court,
D. Delaware.

March 26, 1985.

James F. Kipp, and Adele B. Blandin, Esquire of Trzuskowski, Kipp, Kelleher & Pearce, Wilmington, Del., for plaintiff.

Joseph J. Farnan, Jr., U.S. Atty., and Sue L. Robinson, Asst. U.S. Atty., Wilmington, Del., for defendant; Beverly Dennis, III, Regional Atty., John E. Newton, Jr., Asst. Regional Atty. and J. Stratton Shartel, Legal Asst., Dept. of Health and Human Services, Philadelphia, Pa., of counsel.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final decision

of the Secretary of Health and Human Services denying plaintiff's claim for disability benefits under the Social Security Act. The claimant had sought and obtained a hearing before an Administrative Law Judge (hereinafter "ALJ"). The ALJ's decision was subsequently affirmed by another administrative body and now stands as the Secretary's final decision in this matter. Presently before the Court are the cross-motions of plaintiff and defendant for summary judgment based on the decision of and record before the ALJ.

This Court has noted on previous occasions that district courts are confronted by appeals from the Secretary's decisions denying disability benefits with increasing frequency. *See Allen v. Schweiker*, 567 F.Supp. 1204, 1206 (D.Del.1983). The decisions are dressed up with a summary of the evidence and findings in which "the ALJ has decided every important issue of credibility against the claimant." *Id.* The Court has found all too often that, upon review of the record, the Secretary's decision is not supported by substantial evidence. *See, e.g., id.; Timbers v. Hecker*, C.A. 83–674 (D.Del., May 10, 1984); *Ridgway v. Heckler*, C.A. 83–334 (D.Del., March 9, 1984). This case is no exception to this disturbing pattern.

The Court has no alternative but to remand this case to the Secretary with directions to assist her deliberations in subsequent proceedings.

BACKGROUND FACTS

On November 27, 1981, the plaintiff, Leon Root, applied for disability benefits under the Social Security Act, complaining that he suffered from debilitating lower back and neck pain. (Tr. 74).[1] He was given notice that his claim had been disapproved on March 22, 1982 (Tr. 80), and on May 26, 1982, he sought reconsideration. (Tr. 82). Upon reconsideration, the Social Security Administration upheld its previous denial of disability. (Tr. 85).

On March 3, 1983, plaintiff appeared at a hearing before an ALJ who considered his claim *de novo*. Both plaintiff and plaintiff's vocational expert testified at the hearing and a number of medical reports of varying degrees of specificity were introduced. The ALJ, after considering the testimony and the evidence, issued an opinion on May 20, 1983. (Tr. 12–25). Plaintiff filed a request for review of the ALJ's decision. (Tr. 11). The request was followed by the submission of additional medical evidence. On July 25, 1983, the Appeals Council denied plaintiff's request, (Tr. 10), and subsequently reaffirmed the Secretary's position after considering the additional evidence. (Tr. 3).

The facts as developed before the ALJ are as follows: The claimant was born on February 2, 1932 and was 50 years old at the time of the hearing. He completed the eighth grade. Root shows a record of employment extending back to September of 1967. (Tr. 90). Heavy lifting was a common requirement of each job he has held since then. Most recently, from July, 1973 to September 2, 1981, he was employed by W.L. Gore & Associates, Inc. as a maintenance mechanic. (Tr. 75). He performed lawn work, simple plumbing tasks, minor wood and metal repairs, and repairs to roofs. His functions also included driving tractors and trucks, refinishing floors, moving office furniture, and digging ditches. (Tr. 91).

Prior to September 2, 1981, the date from which Root claims he was no longer able to work, Root had extensive but non-debilitating medical problems. These problems included an incipient arthritic condition beginning in the late 1970s (Tr. 116, 125), hypertension (Tr. 125), and diabetes melitis which was diagnosed in 1980 (Tr. 125). He had fractured his coccyx in the early 1970s from which he continues to suffer occasional pain. (Tr. 63). He had gout at one time which caused kidney problems, but the condition now appears to be controlled. (Tr. 125). Finally, the plaintiff is deaf in one

---

1. All references and page numbers are to the Transcript of the proceedings of Claimant Leon

Root provided by the Secretary pursuant to 42 U.S.C. § 405(g).

ear, and has only about 70% hearing in his other ear. (Tr. 62).

These preexisting infirmities did not prevent the plaintiff from working prior to September 2, 1981, nor were they the direct cause of his alleged inability to continue working after that time. The source of plaintiff's problems began on August 30, 1981. Plaintiff was in a relatively minor auto accident. Within three days, according to the plaintiff, the pain from his lower back and neck had become so severe that he was unable to work. (Tr. 64). Since that time, he has been unable to resume employment because of his pain.

Since his automobile accident and during the pendency of his claim before the Secretary, Root has seen at least six doctors to evaluate his symptoms of lower back and neck pain. The records and reports resulting from these consultations are of varying degrees of specificity, reflecting, in part, the particular physician's knowledge and familiarity with the claimant's medical history. The opinions contained in the records and reports submitted to the ALJ extend over a period of slightly more than two years, and to some extent, reflect revised assessments of the claimant's condition based on the duration of his symptoms and his responses to various forms of treatment.

Among the six physicians that saw Root, there is rough consistency in their respective diagnoses. All of the physicians including the two doctors that evaluated the claimant on behalf of the Secretary concurred in a diagnosis of Root as exhibiting degenerative arthritic condition of the cervical and lumbar regions of the spine and more particularly, as suffering from degenerative disc disease. (Dr. Davis: Tr. 117; Dr. Hershey: Tr. 119; Dr. Magalong: Tr.

121; Dr. Vates: Tr. 128, 160–61; Dr. Hogan: Tr. 127; Dr. Celello: Tr. 151). Generally the doctors found no muscle weakness or motor loss, and only some limitation of motion in the spine.

Dr. Vates, Root's treating neurologist, initially saw Root in March of 1982. He was the first, among the many doctors who saw Root, to recognize that some of Root's pain might be caused by a diabetic neuropathy. (Tr. 124). This was subsequently corroborated in an electromyographic study performed at the end of March. (Tr. 131–32). In late June and early July of 1982, the plaintiff was hospitalized with severe back pain, during which time Dr. Vates revised his earlier diagnosis, and concluded that the diabetic neuropathy was a more significant factor in causing Root's pain than previously thought. (Tr. 128).[2] Dr. Vates also conclusively rejected any diagnosis of nerve root irritation, (Tr. 124), which earlier had been suggested by one of the Disability Determinations Service's examining physicians. (Tr. 120).

Of the six physicians who saw the claimant, only three expressed opinions about the claimant's residual functional capacity. Dr. Davis' evaluation was the most pessimistic of these, opining that Root was unable to work even in an entirely sedentary job. (Tr. 159).[3] Dr. Hogan examined the claimant on behalf of an insurance company. His assessment was without benefit of Dr. Vates' diagnosis of a diabetic neuropathy. Nevertheless, Dr. Hogan concluded that it was unlikely that Root could ever return to his former type of employment. The doctor, however, expressed hope that the claimant would improve somewhat so that he could resume some lighter form of employment. (Tr. 127).[4]

---

2. Dr. Vates' diagnosis of a diabetic neuropathy was affirmed by the Secretary's physician examiner in August, 1982. (Tr. 150).

3. Dr. Davis wrote another letter on behalf of the claimant after the ALJ's decision. (Tr. 6). In view of the Court's disposition of this matter based on the record before the ALJ, the Court felt it was unnecessary to address this additional piece of evidence. The Court, however, notes

that the opinion expressed therein is substantially the same as offered by Dr. Davis prior to the hearing. (Tr. 159).

4. Dr. Hogan subsequently was contacted by plaintiff's counsel to perform an examination of the plaintiff after the ALJ's decision. Dr. Hogan sent a letter to the attorney expressing his opinion that at best plaintiff could perform "intermittent telephone solicitation from his home."

Dr. Vates' three-page letter, dated February 24, 1984, provides the most detailed and comprehensive evaluation of Root's residual functional capacity. Dr. Vates noted that Root showed a marked impairment in his ability to lift or bend and that these difficulties were of a more or less permanent nature. (Tr. 161). Dr. Vates noted that while the claimant could stand for some length of time, he could walk only short distances. *Id.* Thus, Dr. Vates concluded that a return to the claimant's customary form of employment was out of the question, but that less strenuous activities were a possibility. *Id.*

Inexplicably, neither of the doctors performing examinations for the Disability Determinations Service offered evaluations of Root's residual functional capacity.

The ALJ rejected Root's claim for disability in a decision announced May 20, 1983. Although recognizing the claimant was unable to perform heavy work or return to his former job, the ALJ considerably discounted the severity of Root's claims of pain as inconsistent with the clinical evidence. (Tr. 22). Moreover, the ALJ found the record supported a conclusion that the claimant retained a residual capacity for "light work" as that term of art is defined at 20 C.F.R. § 404.1567. (Tr. 22). The ALJ briefly considered the testimony of plaintiff's vocational expert whose testimony was found to support a classification of Root's job skills as semi-skilled. The ALJ skirted the issue of whether the claimant possesses any transferable skills, noting that a finding of non-disability was compulsory, given the ALJ's earlier findings of claimant's limited education, his closely approaching advanced age, and his functional ability to carry out light work, (Tr. 23), whether or not Root's skills were transferable under the Secretary's medical-vocational guidelines. 20 C.F.R. § 404, subpart P, appendix 2, Rules 202.10, 202.11.

(Tr. 9). In view of the Court's disposition of this matter based on the record before the ALJ, the Court felt it was unnecessary to address this additional piece of evidence. The Court, how-

**DISCUSSIONS**

In reviewing the Secretary's final decision under the Social Security Act, the district court's function is limited to ascertaining whether the Secretary's decision is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a responsible mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.1979). Despite the limited scope of its functions, district courts must be equally scrupulous to avoid blindly deferring to the Secretary's decision; courts have an equally important statutory responsibility to petitioners seeking redress from unsubstantiated decisions of the Secretary. *See Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983).

■ Thus, in applying the substantial evidence standard to those administrative decisions denying disability benefits, courts have insisted that the Secretary's decisions be accompanied by a clear and satisfactory explanation of the bases on which they rest. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981). Pat assertions of ultimate factual conclusions are an unacceptable substitute for detailed findings of fact. *See Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir.1983). When inconsistencies arise in the evidentiary record, the Secretary may resolve issues of credibility, but must also provide some rationale for the manner in which the inconsistencies are ultimately resolved. *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983).

The Secretary's responsibility to determine whether or not a claimant is disabled or not within the meaning of the Social Security Act is discharged primarily by ALJs. The Secretary has established rules

ever, notes that the opinion expressed therein is entirely consistent with the decision of the Court today.

that set forth a decision tree which every ALJ must use in arriving at his decision. *See* 20 C.F.R. § 404.1520.

First, the ALJ ascertains whether the applicant currently is working; if so, the claim is denied. *Id.* at § 404.1520(b). Second, the ALJ determines, solely on the basis of medical evidence, *see id.* at § 404.1526, whether the claimed impairment is "severe," that is, of a magnitude sufficient to limit significantly the individual's "physical or mental ability to do basic work activities"; if it is not, the claim is denied. *Id.* at § 404.1520(c). Third, the ALJ decides, again using only medical evidence, whether the impairment equals or exceeds in severity certain impairments described in Appendix 1 of the regulations; if it does, the claimant automatically is awarded disability benefits. *Id.* at § 404.1520(d). Fourth, the ALJ considers whether the applicant has sufficient "residual functional capacity"—defined as what an individual "can still do despite [his] limitations"—to perform his past work; if so, the claim is denied. *Id.* at § 404.1520(e); *see id.* at § 404.1545(a). Finally, the ALJ adjudicates, on the basis of the claimant's age, education, work experience, and residual functional capacity, whether the applicant can perform any other gainful and substantial work within the economy. *Id.* at § 404.1520(f).

*Santise v. Schweiker,* 676 F.2d 925, 927 (3d Cir.1982).

The ALJ's findings in this case make clear that Root's claim was denied at the fifth and final step. The Secretary carries the burden of proof in this fifth step to show that "the claimant given [his or her] age, education and work experience has the capacity to perform specific jobs that exist in the national economy." *Wallace v. Secretary of Health and Human Services,* 722 F.2d 1150, 1153 (3d Cir.1983) (*quoting Rossi v. Califano,* 602 F.2d 55, 57 (3d Cir. 1979)). The Secretary is permitted to rely on rules contained in Department promulgated medical-vocational guidelines in discharging her burden. *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The Secretary, however, is not relieved of her duty to make certain findings pertaining to the overall condition of the claimant before applying these rules. *Santise v. Schweiker,* 676 F.2d 925, 934 (3d Cir.1982). The purpose of this requirement is twofold: first, the findings are necessary to assume that use of the grid in the particular situation is appropriate; and secondly, the findings are required to determine which so-called grid rule should be applied to the claimant. A careful examination of the record in this matter reveals that many of the ALJ's findings in anticipation of applying the medical-vocational guidelines are not supported by substantial evidence.

### 1. The ALJ's Evaluation of Claimant's Residual Functional Capacity.

▮ The ALJ concluded that Root's impairments left him with a residual functional capacity[5] to perform light work.[6] Plaintiff argues that he is at best capable of performing sedentary work[7] and quite pos-

---

**5.** Residual functional capacity is defined as the type of work a claimant can still perform despite his physical, mental or other non-exertional impairments. 20 C.F.R. § 404.1545(a). The Secretary's rules set forth five physical exertion categories: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 404.1567.

**6.** 20 C.F.R. § 404.1567(b) (1984) defines light work as:

... involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifting may be very little, a job is in this category when it requires a good deal of walking or standing, or when it in-

volves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

**7.** 20 C.F.R. § 404.1567(a) (1984) defines sedentary work as:

... involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small

sibly is completely disabled.[8] The ALJ misstated the evidentiary record in reaching his conclusion.

As discussed above, only three of the six doctors rendered any opinion about claimant's residual functional capacity. The ALJ stated that Dr. Hogan had affirmed that Root could perform only light work. (Tr. 21).[9] What, in fact, Dr. Hogan had said was that Root "hopefully will improve sufficiently that he could return to a lighter type of employment." (Tr. 127). The ALJ mischaracterized Dr. Hogan's evaluation in two respects. First, Dr. Hogan's actual evaluation is ambivalent whether Root will ever be able to work while the ALJ claims that Dr. Hogan's assertion indicated that Root was presently fit to resume working. Secondly, the ALJ implied that "lighter type of work" was synonymous with "light work" when Dr. Hogan could just as easily have been referring to sedentary work.

The ALJ's characterization of Dr. Vates' evaluation of the claimant's residual functional capacity reflects a careless disregard for the actual evidence in this case. The ALJ noted: "The residual functional capacity evaluation of Dr. Vates in Exhibit 27 takes into account the symptoms alleged by the claimant and yet allows for a finding of light work." (Tr. 22). Dr. Vates' statement is at variance with this summary. Dr. Vates noted that Root suffered from "marked impairment of bending or lifting." (Tr. 161). He went on to conclude that "activities limited to more *sedentary* actions, would not have the same deleterious effect on him." (Tr. 161) (emphasis added). Thus, rather than supporting a finding that the claimant was capable of undertaking *light work,* Dr. Vates' assessment unequivocally supports the claimant's contention that he is able to perform at best *sedentary* work.

The ALJ entirely rejected Dr. Davis' conclusion that the claimant was totally disabled, as inconsistent with the evaluations of other doctors. Although Dr. Davis disagreed with the other doctors as to the severity of Root's impairments, it was error to entirely disregard his opinion because of this difference of opinion as to the severity of Root's impairments. The ALJ is first required to attempt to reconcile any differences in opinion before rejecting one as inconsistent with the others. As such, Dr. Davis' testimony should have at least weighed in favor of a finding of a sedentary capacity rather than the ALJ's finding of light work.

The only medical evidence the ALJ could adduce in support of his conclusion was an enigmatic handwritten phrase in a questionnaire to which Dr. Hershey, an orthopedist, responded (Tr. 21) (citing to Exhibit 16). To the best of this Court's abilities, Dr. Hershey's phrase reads: "Had course of treatment [?], P.T. [physical therapy?] & exercise, when last seen was improved I advised to [?] try light duty." (Tr. 119). This simply does not qualify as a competent or probative evaluation of the claimant's physical exertional strength. *See Rossi v. Califano,* 602 F.2d 55, 58 (3d Cir. 1979) (medical expert's testimony that an

---

tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

**8.** A claimant who is unable to satisfy the minimal requirements for sedentary activity is deemed disabled.

**9.** The ALJ may not have been referring to Dr. Hogan's conclusion at all, but rather to Dr. Hogan's statement that the claimant had reported that Dr. Hershey had told the claimant that he could go back to work. If so, the ALJ's reliance on the claimant's statement to the ex-

clusion of Dr. Hogan's own opinion and without soliciting a confirming statement from Dr. Hershey was misplaced. First, the claimant had only an eighth grade education and may not have understood Dr. Hershey's advice clearly. Secondly, Dr. Hogan, in conducting an examination for an insurance company, concluded the claimant was unable to work, although he was fully aware that, according to the claimant, Dr. Hershey had said that the claimant could return to work. Finally, Dr. Hershey's response to a questionnaire sent out in December of 1981, made clear that his statement to claimant was at most advice "to try light duty." (Tr. 119).

individual is employable cannot constitute substantial evidence unless the testimony contains a statement of the type of work the claimant is suited to perform). Even if Dr. Hershey's cryptic comments could be accepted as an assertion that plaintiff possessed the residual functional capacity to perform light work, both the quality of the report and its inconsistency with the detailed findings of three other physicians should have led the ALJ to discount Dr. Hershey's remarks as against the weight of the evidence.

Finally, the ALJ's decision states that the claimant's testimony regarding his activities around the home offered further support for finding Root equipped to perform light work. (Tr. 22). Courts have frequently stated that sporadic or transitory activity around the home is an unreliable indicator of residual functional capacity. *Smith v. Califano*, 637 F.2d 968, 971–72 (3d Cir.1981). This rule is clearly applicable to the type of reasoning employed by the ALJ in this case. Such an error, by itself, might be grounds for a remand. Here, however, not only has the ALJ made an improper inference, but, contrary to the ALJ's assertion, the claimant's testimony simply does not provide any foundation for such an inference. Root testified that his wife does the grocery shopping, shovels the snow, and mows the yard. (Tr. 58). Root, himself, sometimes does the breakfast dishes and picks up around the house. (Tr. 57). He is unable to walk two blocks to get a paper. (Tr. 59). He also helps with the laundry, but only in moving wet clothes from the washing machine to the dryer. (Tr. 60). His wife must carry the laundry downstairs. *Id.* The limited activities of the claimant offer no independent grounds for concluding that he could perform light work within the meaning of 20 C.F.R. § 404.1567(b).

### 2. The ALJ's Evaluation of Claimant's Pain.

The ALJ erred in relying on his personal judgment and personal observation of the claimant in ascertaining the medical severity of the claimant's pain. In his decision, the ALJ explained: "The clinical findings were not abnormal enough to establish that he [Root] suffers from a condition of such severity that it could be reasonably be expected to cause the pain alleged. There is no evidence as to any consistent muscle spasm, tenderness or any significant limitations due to pain." (Tr. 22). This explanation is unsatisfactory because it depends upon an unsubstantiated medical inference to rebut testimony of the claimant that would otherwise be entitled to great weight.

■ While the evidence supports the finding that the claimant did not suffer from muscle spasms, muscle tenderness or any significant limitations of the spine due to pain, at no point in the record does any doctor suggest the lack of such symptoms provides a basis for inferring that Root is not suffering from pain. Root did suffer from pain-causing disabilities such as a diabetic neuropathy as well as a neuropathy arising from his degenerative osteoarthritic condition. His treating physicians have at various times prescribed pain-killing medication. Thus, the ALJ's inference reflects nothing more than his own medical judgment that must be rejected by this Court as beyond "the ambit of the ALJ's expertise." *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir.1983); *Allen v. Schweiker*, 567 F.Supp. 1204, 1209 (D.Del.1983).

■ Because the claimant suffered from at least two medical conditions that could reasonably be expected to cause pain, the claimant's testimony as to his pain was entitled to due consideration from the ALJ. *Green v. Schweiker*, 749 F.2d 1066, 1070–71 (3d Cir.1984) (construing Third Circuit precedent in light of the Social Security Disability Reform Act of 1984, Pub.L. 98–460, § 3(a), 51 L.W. 39, 41 (approved September 28, 1984) ). *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir.1979). Root repeatedly testified regarding his recurring pain. (Tr. 42–43, 54). Such testimony should have been afforded substantial credibility in view of the claimant's record of more than sixteen years of employment.

*Podedworny v. Harris,* 745 F.2d 210, 217 (3d Cir.1984); *Taybron v. Harris,* 667 F.2d 412, 415 n. 6 (3d Cir.1981) (per curiam).

▪ The ALJ's decision repeats these same errors insofar as it relied on the ALJ's own observations from the hearing to the effect that the claimant neither exhibited significant discomfort nor displayed symptoms that would affect his ability to perform on a sustained basis. (Tr. 22). The ALJ's opinion of claimant's medical condition based upon his personal observation is not to be counterpoised against the uncontradicted opinions of medical experts, *see Lewis v. Califano,* 616 F.2d 73, 76–77 (3d Cir.1980); *accord Kelly v. Railroad Retirement Board,* 625 F.2d 486, 494 (3d Cir.1980), because lay observations are an inherently unreliable basis for medical conclusions. Moreover, the ALJ's attempts during the hearing to elicit responses from the claimant as to why he did not show greater discomfort after sitting for an hour are ploys that have been repeatedly decried as a form of "sit and squirm" jurisprudence. *Van Horn v. Schweiker,* 717 F.2d 871, 874 (3d Cir.1984). Such ploys have no place in the vital task of administering disability benefits and further, represent a stock in trade that ALJs would do well to discard.

### 3. Directions on Remand.

The ALJ's findings contain numerous errors that had a decisive effect on the outcome of these proceedings before the Secretary. Most notably, the ALJ's erroneous finding that substantial evidence existed to support a finding that the claimant has a residual capacity for light work led to an application of rules from a less favorable table under the medical-vocational guidelines to the claimant's case. Therefore, the matter must be remanded for further proceedings not inconsistent with the directions set forth below.

The record before the Court provides an insufficient basis with respect to the requisite elements to support an outright reversal of the Secretary's decision denying benefits. *Podedworny v. Harris,* 745 F.2d 210, 221 (3d Cir.1984). Under the circumstances, it would be unreasonable to permit the ALJ to reconsider the issue of claimant's residual capacity *de novo. Id.* at 222. The weight of the evidence before the ALJ supports a finding that the claimant possesses a residual capacity for sedentary work or less. On remand, the ALJ may determine whether the claimant is totally disabled or possesses a residual capacity for sedentary work.

In lieu of the fact that the claimant's residual capacity will be reclassified on remand, the ALJ will have to undertake a more careful examination of the claimant's work skills if it is determined he possesses a residual capacity for sedentary work. In the prior proceedings before the Secretary, the ALJ considered the claimant's skills only in a cursory fashion. On remand and after hearing additional evidence, the ALJ is free to reconsider its finding that the claimant was semi-skilled. Specifically, the ALJ should determine exactly what kind of plumbing and carpentary work the claimant engaged in, the amount of supervision he had when performing these jobs, and the fraction of his job time devoted to such activities.

In the event that the claimant is found able to perform sedentary work and to possess sufficient skill to be classified as semi-skilled, the ALJ must determine whether these skills are transferable. *See* 20 C.F.R. § 404, subpart P, appendix 2, Rules 202.19, 202.11. The vocational expert in the prior proceedings expressed certain conclusions without specifically identifying the claimant's job skills. (Tr. 70). Such testimony undermines the ability of this Court to perform its reviewing function. This deficiency is significant because of the frequent confusion of experts regarding the legal distinction between transferable skills and basic work abilities. *See Podedworny v. Harris,* 745 F.2d 210, 220–21 (3d Cir.1984); *Wallace v. Secretary of Health and Human Services,* 722 F.2d 1150, 1156 (3d Cir.1983). Moreover, any jobs identified by the vocational expert as ones to which the claimant's skills are

transferable, must themselves be skilled or semi-skilled jobs for, by definition, skills are not transferable to an unskilled job. *See Podedworny v. Harris,* 745 F.2d 210, 220–21 (3d Cir.1984).

Finally, the ALJ concluded that the claimant did not suffer from any debilitating non-exertional impairments. (Tr. 23). The ALJ's discussion left the impression that the claimant, however, suffered from some non-exertional impairments. For example, the claimant's loss of hearing in one ear and 70% hearing in the other might be considered a non-exertional impairment. Similarly, the cumulative effect of his medication may also constitute another non-exertional factor that the Secretary should not ignore in her decision. *See Green v. Schweiker,* 749 F.2d 1066, 1068 & n. 2 (3d Cir.1984).

Thus, on remand, the Secretary should determine whether the claimant suffers from any non-exertional impairments. Only after this determination has been made should the effect of these impairments on the claimant's ability to engage in gainful working activity be considered. Of course, under most conditions, use of the medical-vocational guidelines when non-exertional impairments are present, constitutes error if the guidelines are used to deny benefits. *Caffee v. Schweiker,* 752 F.2d 63, 67 n. 5 (3d Cir.1985); *Burnam v. Schweiker,* 682 F.2d 456, 468 (3d Cir.1982). The Secretary, regardless of whether the medical-vocational guidelines can or cannot be used, retains the burden of showing that gainful work activities exist in the national economy for which the claimant has the capacity to perform, in view of his combination of impairments as a whole. *See Green v. Schweiker,* 749 F.2d 1066, 1068 (3d Cir. 1984) (remand was necessary when ALJ failed to consider claimant's combination of impairments together); *Wallace v. Secretary of Health and Human Services,* 722 F.2d 1150, 1155 n. 8 (3d Cir.1983) (per curiam) (ALJ's duty to render specific findings of fact regarding the claimant's combination of impairments is not discharged by conclusory statement that claimant's impairments were considered in combination).

An order will issue remanding this case to the Secretary for future proceedings consistent with this Opinion.